UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------X

MAIK LANKAU,

                    Plaintiff,                    16 Civ. 8690

     -against-                                    OPINION

LUXOFT HOLDING, INC. and LUXOFT
USA, INC.

                    Defendants.

------------------------------------------X

A P P E A R A N C E S:

          Attorneys for Plaintiff

          TAYLOR & COHEN LLP
          40 Worth Street, 10th Floor
          New York, NY 10013
          By:  Robert Cohen, Esq.
               Zachary S. Taylor, Esq.



          Attorneys for Defendants

          SHERMAN WELLS SYLVESTER & STAMELMAN LLP
          54 W. 40th Street, 11th Floor
          New York, NY 10018
          By:  Anthony J. Sylvester, Esq.
               Jordan D. Weinreich, Esq.

**Sweet, D.J.**

Defendants Luxoft USA, Inc. ("Luxoft USA") and Luxoft Holding, Inc. ("Luxoft Holding") (collectively, the "Defendants" or "Luxoft") have moved pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss the complaint of Plaintiff Maik Lankau ("Lankau" or the "Plaintiff") (the "Complaint"). Based on the conclusions set forth below, Defendants' motion is granted in part and denied in part.

## Prior Proceedings

Plaintiff filed his Complaint in this diversity action on November 9, 2016. (Dkt. 1.) In the Complaint, Plaintiff alleges: fraudulent inducement by Defendants (Compl. ¶¶ 82-90); fraud by Defendants (Compl. ¶¶ 91-98); violation of Section 10(b) of the 1934 Securities Act and Rule 10(b)-(5) by Luxoft Holding (Compl. ¶¶ 99-105); breach of contract by Defendants (Compl. ¶¶ 106-11); and tortious interference with contract by Luxoft Holding (Compl. ¶¶ 112-18).

On January 9, 2017, Defendants filed the instant motion to dismiss. The motion was heard and marked fully submitted on February 23, 2017.

1

**Facts**

The Complaint sets forth the following allegations, which are assumed true for the purpose of this motion to dismiss. See Koch v. Christie's Int'l PLC, 699 F.3d 141, 145 (2d Cir. 2012).

Luxoft Holding, and its wholly-owned subsidiary Luxoft USA, provide software development and support, product engineering and testing, technology consulting services for multinational corporations. (Compl. ¶¶ 18, 20.) Defendants have dedicated delivery centers and offices throughout the world. (See Compl. ¶ 20.)

From May through July 2014, Defendants recruited Lankau to become Luxoft's Managing Director for Telecommunication and Embedded Systems; Defendants were looking for someone to lead its international Telecommunication and Embedded Systems division. (Compl. ¶¶ 2, 24, 27-28, 34.)

During the negotiations with a Luxoft-hired recruiter, Lankau expressed disinterest in any new position that did not have an equity component as part of the compensation, as Lankau would forfeit unvested stock options if he left his current employer, Danaher Corporation ("Danaher") as well as sufficient

managerial breadth. (See Compl. ¶¶ 25, 33, 58). In response,
both the recruiter and Luxoft employees, such as Michael
Minkevich ("Minkevich"), made oral and written assurances that
the Managing Director's compensation would include a stock
options award. (Compl. ¶¶ 26, 32, 38-40). In email messages to
Lankau, Minkevich estimated the value of the proposed equity
award at $1.3 million over a four-year vesting period. (See
Compl. ¶ 38). Lankau was assured by Luxoft that he would receive
his stock options sometime in August 2014, but that the equity
compensation plan, termed "Stock Option Plan III" or "SOP III,"
still needed to be approved by Luxoft's Board of Directors.
(Compl. ¶¶ 39-40.)

Lankau executed the final employment contract with Luxoft
USA (the "Employment Agreement") on July 11, 2014. (Compl.
¶ 42.) After signing the Employment Agreement, Lankau left
Danaher and began working at Luxoft USA in mid-August 2014.
(Compl. ¶¶ 5, 42, 44.)

Of relevance to the present case, the Employment Agreement
has several provisions detailing Lankau's employment
responsibilities, compensation, and at-will status.

3

First, with regard to employment responsibilities, the Employment Agreement states that Lankau's responsibilities included "Business Development" and "Delivery and Operations," which in further detail entailed the following: "Accountable for operational/financial metrics and overall business results of practice"; "Manage/oversee multiple delivery teams (Delivery Centers) to ensure client satisfaction"; "Provide risk assessment and reliable forecasting"; "Cultivate cross-functional communication with other Lines of Business/practices"; "Provide mentoring for the practice senior technical management (Delivery Managers)." (Compl. ¶ 57; see also Compl., Ex. 1 at Ex. A.) Lankau left Danaher, in part, because of these broad managerial responsibilities. (See Compl. ¶ 58-59.)

Second, with regard to compensation, the Employment Agreement states:

> Executive's Base Salary shall be subject to annual review for adjustment at the discretion of the Board (any salary so adjusted shall thereafter be the Base Salary for purposes of this Agreement). The next salary adjustment is scheduled for April 1, 2015.
>
> * * * *
>
> In addition to (but without duplication of) the Base Salary and any bonus, while Executive is employed by the Corporation, Executive shall be eligible to participate in the Stock Option Plan (subject to

4

approval by the Board and the Corporation's policies), and such other pension, life insurance, health insurance, disability insurance and other employee benefits plans, if any, which the Corporation may from time to time make available to its executive employees generally.

(Compl., Ex. 1 ¶¶ 4(a), 4(d).) Lankau alleges that while "Stock Option Plan" was not defined in the Employment Agreement, Defendants informed him that it referred to SOP III. (See Compl. ¶ 68.) In addition, Lankau states that his salary was never reviewed for adjustment while employed at Luxoft. (Compl. ¶ 65.)

Lastly, with regard to Lankau's at-will employment and termination conditions, the Employment Agreement states:

Executive understands, acknowledges, and agrees hat Executive is an "at-will" Employee, and that Executive's employment by the Corporation . . . maybe be terminated by the Corporation (through action by the Board) for any reason or no reason . . . subject only to the contractual rights upon termination set forth herein; provided that if the Corporation terminates the Executive without Cause, the Executive shall be entitled to ninety (90) days prior notice to be given by the Corporation.

(Compl., Ex. 1 ¶ 5(a).)

On or about November 11, 2014, Luxoft Holding's board of directors approved SOP III, an equity compensation plan for Luxoft USA employees, with shares scheduled to vest starting on

January 1, 2016. (Compl. ¶ 46.) At that time, Lankau was not granted any equity compensation. (Compl. ¶ 47).

While employed by Luxoft, Lankau alleges that he was repeatedly told, orally and in writing, that he would be awarded his equity compensation package at some future date. (See Compl. ¶¶ 10, 49-53). Examples in the Complaint include being told in November 2014 by Minkevich that Lankau would only receive his equity compensation in August 2015, a year after starting, Compl. ¶ 49); being told in October 2015, by Luxoft Holding's CEO Dmitry Loschinin ("Loschinin"), that Lankau would receive equity compensation at some point in the future, (Compl. ¶ 51); in February 2016, in an email from Loschinin, being told the same and that the equity package was awaiting Board approval, (Compl. ¶ 53).

Around January 2015, Lankau was informed that his job responsibilities as listed in the Employment Agreement would change—specifically, he would not have oversight with respect to the Delivery Center—which Lankau accepted in conjunction with the promises from Luxoft that he would in the future receive equity compensation. (See Compl. ¶¶ 61, 63.)

6

On August 15, 2016, Lankau was told he would be terminated,
without cause, and his last day of work would be September 1,
2016. (Compl. ¶ 74.) Upon termination, Luxoft offered Lankau a
severance package of $100,000 if he agreed to waive any and all
claims. (Compl. ¶ 12.)

## Applicable Standards

On a Rule 12(b)(6) motion to dismiss, all factual
allegations in the complaint are accepted as true and all
inferences are drawn in favor of the pleader. Mills v. Polar
Molecular Corp., 12 F.3d 1170, 1174 (2d Cir. 1993). A complaint
must contain "sufficient factual matter, accepted as true, to
'state a claim to relief that is plausible on its face.'"
Ashcroft v. Iqbal, 556 U.S. 662, 663 (2009) (quoting Bell Atl.
Corp. v. Twombly, 550 U.S. 544, 555 (2007)). A claim is facially
plausible when "the plaintiff pleads factual content that allows
the court to draw the reasonable inference that the defendant is
liable for the misconduct alleged." Iqbal, 556 U.S. at 663
(quoting Twombly, 550 U.S. at 556). In other words, the factual
allegations must "possess enough heft to show that the pleader
is entitled to relief." Twombly, 550 U.S. at 557 (internal
quotation marks omitted).

While "a plaintiff may plead facts alleged upon information and belief 'where the belief is based on factual information that makes the inference of culpability plausible,' such allegations must be 'accompanied by a statement of the facts upon which the belief is founded.'" Munoz-Nagel v. Guess, Inc., No. 12 Civ. 1312 (ER), 2013 WL 1809772, at *3 (S.D.N.Y. Apr. 30, 2013) (quoting Arista Records, LLC v. Doe 3, 604 F.3d 110, 120 (2d Cir. 2010)); Prince v. Madison Square Garden, 427 F. Supp. 2d 372, 384 (S.D.N.Y. 2006); Williams v. Calderoni, 11 Civ. 3020 (CM), 2012 WL 691832, at *7 (S.D.N.Y. Mar. 1, 2012)). The pleadings, however, "must contain something more than . . . a statement of facts that merely creates a suspicion [of] a legally cognizable right of action." Twombly, 550 U.S. at 555 (citation and internal quotation omitted).

In considering a motion to dismiss, "a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 111 (2d Cir. 2010).

The standard is higher to state a claim for securities fraud. See Emps.' Ret. Sys. v. Blanford, 794 F.3d 297, 304 (2d Cir. 2015); S. Cherry St., LLC v. Hennessee Grp., LLC, 573 F.3d

98, 110 (2d Cir. 2009). These claims are subject to the strict pleadings standards of both Rule 9(b) and the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4(b)(2) ("PSLRA"), enacted in 1995 "[a]s a check against abusive [securities] litigation by private parties . . . ." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 313, 319, 321 (2007). Under these requirements, a plaintiff must allege sufficient particularity pursuant to Rule 9(b) and, under the PSLRA, demonstrate that the defendant made "[m]isleading statements and omissions . . . of a material fact," 15 U.S.C. § 78u-4(b)(1), and acted with the "[r]equired state of mind," id. § 78u-4(b)(2), known as the "scienter requirement," Blanford, 794 F.3d at 305.

To satisfy the pleading standard for a misleading statement or omission, Rule 9(b) requires that "the circumstances constituting fraud" be "state[d] with particularity." Fed. R. Civ. P. 9(b). This, "a complaint must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." Blanford, 794 F.3d at 305 (internal quotation marks and citation omitted). A plaintiff "may not lump separate defendants together in vague and collective fraud allegations but must inform each defendant

of the nature of his alleged participation in the fraud." Alki
Partners, L.P. v. Vatas Holding GmbH, 769 F. Supp. 2d 478, 493
(S.D.N.Y. 2011). The PSLRA has similar requirements. See 15
U.S.C. § 78u-4(b)(1)(B).

To show scienter under the PSLRA, a "plaintiff must . . .
allege facts that give rise to a strong inference of fraudulent
intent." 380544 Canada, Inc. v. Aspen Tech., Inc., 633 F. Supp.
2d 15, 29 (S.D.N.Y. 2009). Specifically for the PSLRA, a
plaintiff needs to show a strong inference that "the defendant
acted with the required state of mind" with respect to "each act
or omission alleged to violate this chapter." 15 U.S.C. § 78u-
4(b)(2)(A); see also Tellabs, 551 U.S. at 313. The Second
Circuit has found the PSLRA's scienter requirement met when a
plaintiff alleges facts showing either a "motive and opportunity
to commit the fraud" or "strong circumstantial evidence of
conscious misbehavior or recklessness." Blanford, 794 F.3d at
306 (quoting ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d
87, 99 (2d Cir. 2007)).

To prove "state of mind" under the PSLRA requires a showing
"of intent to deceive, manipulate, or defraud," Ernst & Ernst v.
Hochfelder, 425 U.S. 185, 188 (1976), or recklessness, In re
Carter-Wallace, Inc., Sec. Litig., 220 F.3d 36, 39 (2d Cir.

10

2000). While "a plaintiff realistically cannot be expected to plead a defendant's actual state of mind," Chill v. Gen. Elec. Co., 101 F.3d 263, 267 (2d Cir. 1996) (citation omitted), the "strong inference" must show that the inference of fraudulent intent is "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of non-fraudulent intent." Tellabs, 551 U.S. at 314. Thus, the Court "must consider, not only inferences urged by the plaintiff, . . . but also competing inferences rationally drawn from the facts alleged." Id.

## **Defendants' Motion to Dismiss is Granted in Part and Denied in Part**

### 1. Fraudulent Inducement and Fraud Claims (First and Second Claims)

Defendants have moved to dismiss Plaintiff's fraudulent inducement and fraud claims as against both Defendants. Defendants make two arguments: that Plaintiff's fraud claims are duplicative of his breach of contract claim and that the fraud claims are not pled with the requisite particularity. With regard to Plaintiff's fraudulent inducement claim, special damages have been alleged and the allegations of fraud are sufficient, and Defendants' motion as to the First Claim is denied; because Plaintiff's fraud claim damages are identical to

11

those sought in the breach of contract claim, however, Defendants' motion as to the Second Claim is granted.

To state a claim for fraud under New York law[1], "a plaintiff must show that (1) the defendant made a material false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of such reliance." Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc., 98 F.3d 13, 19 (2d Cir. 1996) (quoting Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank, 57 F.3d 146, 153 (2d Cir. 1995)). Fraudulent inducement claims under New York law are similar: "the defendant must have made a misrepresentation of a material fact, that was known to be false and intended to be relied on when made, and that the plaintiff justifiably relied on that misrepresentation to its injury." Amida Capital Mgmt. II, LLC v. Cerberus Capital Mgmt., L.P., 669 F. Supp. 2d 430, 444 (S.D.N.Y. 2009) (citing Braddock v. Braddock, 60 A.D.3d 84, 86, 871

---

[1]    Both parties argue New York law in their briefs and make no mention of the law of any other forum on this issue. Accordingly, New York law properly applies. Tehran-Berkeley Civil & Env't Eng'rs v. Tippetts-Abbett-McCarthy-Stratton, 888 F.2d 239, 242 (2d Cir. 1989) (applying New York law "[u]nder the principle that implied consent to use a forum's law is sufficient to establish choice of law").

12

N.Y.S.2d 68 (1st Dept. 2009)). To state a fraud-based claim under New York law, a complaint must contain facts giving rise to a "strong inference of fraudulent intent." Lerner v. Fleet Bank, 459 F.3d 273, 290 (2d Cir. 2006).

Both fraud and fraudulent inducement claims are also subject to Fed. R. Civ. P. 9(b)'s heightened pleading standard that demand particularity of allegations, namely to "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." McCormack v. IBM, 145 F. Supp. 3d 258, 275–76 (S.D.N.Y. 2015) (citation omitted); see Eaves v. Designs for Fin., Inc., 785 F. Supp. 2d 229, 246-47, 251 (S.D.N.Y. 2011) (applying Rule 9(b) to New York State fraud and fraudulent inducement claims).

In addition, "as a general matter, a fraud claim may not be used as a means of restating what is, in substance, a claim for breach of contract." Wall v. CSX Transp., Inc., 471 F.3d 410, 416 (2d Cir. 2006). A "party's failure to fulfill a promise to perform future acts cannot form the basis of a fraud claim, unless that party intended not to fulfill that promise at the time when it was made." Cohen v. Koenig, 25 F.3d 1168, 1172 (2d Cir. 1994). Fraud-based claims like fraud and fraudulent

13

inducement can survive distinct from a breach of contract claim if a plaintiff can show (1) a legal duty separate from the duty to perform under the contract, (2) a fraudulent misrepresentation collateral or extraneous to the contract, or (3) seek special damages that are caused by the misrepresentation and unrecoverable as contract damages. Bridgestone/Firestone, 98 F.3d at 20 (citations omitted).

### a. Special Damages

Plaintiff's fraudulent inducement claim properly pleads special damages independent of his breach of contract claim. The Complaint plausibly alleges that Luxoft fraudulently induced Lankau to leave his job at Danaher to work for Defendants by offering him responsibilities and compensation it did not intend to provide; as a consequence, Lankau states he was injured when he left behind at Danaher unvested equity compensation in the form of stock options. (See Compl. ¶¶ 1, 5, 23, 33, 88.)

Plaintiff supports this position principally with Lam v. Am. Exp. Co., 265 F. Supp. 2d 225 (S.D.N.Y. 2003). There, the court considered a plaintiff's fraudulent inducement claim in which the plaintiff alleged he was induced into switching companies by fraudulently promised incentives at the cost of

14

waiving rights to severance benefits at his old firm. See id. at 232. Such severance benefits, the court reasoned, "were not merely alternate opportunities not pursued by Lam, but were actual benefits to which he otherwise allegedly would have been entitled and which he waived" to work at the second company. Id. at 233. As that plaintiff's fraudulent inducement claim sought "indemnity for the loss suffered through that inducement" separate from his breach of contract claim, the Lam court accepted plaintiff's claim under the special damages exception. Id. at 232 (quoting Deerfield Comm. Corp. v. Chesebrough-Ponds, Inc., 510 N.Y.S.2d 88, 502 N.E.2d 1003, 1004 (1986)) (alterations omitted).

Lam's logic applies here. Lankau alleges that he had to forfeit unvested stock options to switch companies and work at Luxoft, benefits he is neither seeking nor would "be entitled to recover as ordinary damages under a breach of contract claim." Id. at 232; (see Compl. ¶ 88). Thus, Plaintiff's claim for fraudulent inducement is not duplicative of Plaintiff's breach of contract claim.

Under the same logic, however, Plaintiff's fraud claim must be dismissed. The Complaint alleges that Defendants' fraudulent statements to Plaintiff about his equity compensation package

15

while Plaintiff was employed at Luxoft injured him because such statements caused Plaintiff to "continue[] working at Luxoft rather than seeking better compensated positions at other companies." (Compl. ¶ 96.) Plaintiff contends that the Complaint's fraud allegations are special damages because they seek "the reasonable value of the services fraudulently procured" by Luxoft. (Pl.'s Mem. in Opp. at 22, Dkt. 12 (quoting Hanlon v. Macfadden Publ'ns, 302 N.Y. 502, 512 (1951)).

This is not correct. First, the injury alleged – that because of Defendants' fraudulent statements, Plaintiff failed to seek "better compensated positions" – is speculative and unsupported by any allegation of a reasonably inferable employment position Plaintiff was offered or considered. Plaintiff's citation to Hanlon is also inapposite. In Hanlon, an employer made fraudulent statements to its employee that altered the employee's salary from a previously uncontested contractual level; once the fraud was discovered, the court held that the employee was entitled to the difference in labor value between what the employee was versus should have been paid. See Hanlon, 302 N.Y. at 510. Unlike Hanlon, here, the employment contract itself is in dispute, and Plaintiff's fraud claim is predicated on whether his employment contract entitled him to equity compensation while at Luxoft, an allegation specifically

16

referenced in his breach of contract claims. (See Compl. ¶ 109(c).) Furthermore, the alleged fraudulent statements "indicat[ed] [Luxoft's] intent to perform under the contract," and Plaintiff has not sufficiently alleged facts, other than conclusory statements, plausibly indicating anything else at the time. Bridgestone/Firestone, 98 F.3d at 19 (collecting cases). Without having properly pled an exceptions outside a breach of contract claim, Plaintiff's fraud claim cannot be sustained as an independent claim from that of breach of contract.

### b. Particularity

Defendants also challenge the adequacy of Plaintiff's fraud-based allegations with respect to the particularity of the alleged fraud, contending that Plaintiff has failed to allege specific facts that infer fraudulent intent. At this stage of litigation, given the facts alleged, Plaintiff has also met this burden.

Plaintiff has alleged both conversations and email exchanges with specific individuals that plausibly give rise to such an inference. Plaintiff points to a conversation he had in late May 2014 with Minkevich during the recruiting process, where Plaintiff alleges that Minekevich, at Luxoft's direction,

17

told Plaintiff that he would receive equity compensation as part of his employment at Luxoft as a Managing Director, a fact alleged to be important to Plaintiff and which Plaintiff alleges Defendants knew not to be true. (See Compl. ¶¶ 27, 29, 32, 35.) Plaintiff also alleges that on July 2, 2014, in an email exchange with Minkevich, Plaintiff sought clarification on the terms of Plaintiff's employment contract with Luxoft, at which time Minkevich is alleged to have provided details of the equity compensation plan that would have covered Plaintiff's position as a Managing Director, additionally stating:

> Our CEO is expected to sign off the plan by 07/12. After that it will be submitted for the Board approval. The next Board meeting will be held on 08/12, after that each qualified executive will get their piece of the pie. The plan global variables are based on the industry standard practices therefore the chances that the Board will turn the proposal down are very low. Unfortunately, this is all information that I have on the equity compensation for the time being. As I already mentioned, the previous SOP has just ended and the new one is still work-in progress.

(Compl. ¶ 39.)

On July 7, 2014, Minkevich is alleged to have sent another email to Plaintiff about SOP III, which noted for Plaintiff with regard to "Equity compensation: the position in question is eligible to [sic] the Stock Option Plan III. The plan will be submitted to the Board for approval on August 12th. I have

18

provided the guidelines as per the most recent draft." (Compl. ¶ 40.) Plaintiff signed the Luxoft Employment Agreement a few days later, leaving Danaher and his unvested Danaher stock options. (See Compl. ¶ 41.)

None of these communications state or suggest that Lankau's ability to receive equity compensation was dependent on either Board approval of his specific participation or on company policies; rather, the only hurdle represented to Plaintiff was the Luxoft Board's approval of SOP III. With these pleadings, Plaintiff has identified specific speaker, dates, and manners that he contends are fraudulent, complying with the specificity requirements of 9(b). See McCormack, 145 F. Supp. 3d at 276 (denying fraudulent inducement claim on motion to dismiss when claims were specifically alleged).

While a "plaintiff realistically cannot be expected to plead a defendant's actual state of mind," Eaves, 785 F. Supp. 2d at 247 (citation omitted), Plaintiff has sufficiently put forward statements, surrounded by additional supportive allegations, that raise the "strong inference" that Defendants knew they were representing to Plaintiff one set of requirements to acquire Luxoft equity to get him to join when, in fact, the real requirements were different, 380544 Canada, Inc., 633 F.

19

Supp. 2d at 34. Presumably, discovery will illuminate the knowledge and intent of the officers who dealt with Lankau with respect to the Defendants' current interpretation of the employment contract, discussed below. At this juncture, however, fraudulent intent and scienter have been adequately alleged, though not established.

Accordingly, Defendants' motion to dismiss the Complaint's First Claim is denied and the Complaint's Second Claim is granted.

## 2. Securities Fraud Claim (Third Claim)

Defendants have moved to dismiss Plaintiff's securities fraud claims brought under the Section 10(b) of the Securities Exchange Act and the rule implementing the statute, SEC Rule 10b-5 as against Luxoft Holding. As the Complaint fails to adequately plead the "in connection" requirement in satisfaction of the securities fraud statute, Defendants' motion is granted.

Under the Exchange Act's Section 10(b), it is unlawful "[t]o use or employ, in connection with the purchase or sale of any security[,] . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as

20

the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). SEC Rule 10b-5 implements this provision and prohibits "mak[ing] any untrue statement of a material fact." 17 C.F.R. § 240.10b-5(b). "To state a claim under Rule 10b-5 for misrepresentations, a plaintiff must allege that the defendant (1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury." Blanford, 794 F.3d at 305 (citation omitted). The Second Circuit has stated that to state a securities fraud claim, "however deceitful and false the misrepresentations may have been, the plaintiff must be a purchaser or a seller . . . in a purchase or sale as to which there is a claim of fraud." Lawrence v. Cohn, 325 F.3d 141, 154 (2d Cir. 2003)

Defendants first contend that Plaintiff has failed to allege sufficient scienter for his securities fraud claims. As set forth above, however, the Complaint put forward sufficiently adequate, specific allegations that, if assumed true, afford an inference of fraudulent intent that is "at least as compelling" as a non-fraudulent. See Gormley v. Magicjack Vocaltec Ltd., 220 F. Supp. 3d 510, 517 (S.D.N.Y. 2016) (finding that, when

21

"[t]aken together," the complaint established a sufficient
inference of fraud under the PSLRA).

Secondly, Defendants contend that Plaintiff's claim are
unactionable under federal securities law because Plaintiff's
allegations of fraud did not actually affect the value of Luxoft
shares and, therefore, are not connected to the purchase or sale
of a security. Plaintiff, pointing principally to Dubin v. E.F.
Hutton Grp., Inc., argues that offering of equity to induce his
employment at Luxoft constituted a sale of a security under
Section 10(b) and the fraudulent statements affected the value
of the Luxoft securities. 695 F. Supp. 138 (S.D.N.Y. 1988)

In Dubin, a plaintiff received a grant of company stock
through the company's corporate stock plan upon beginning his
employment, equity which was to vest over a six year period per
the plan or vest immediately were the company to be acquired.
See id. at 144-45. However, the company had lied to the
employee, and upon acquisition, his shares were forfeit. See id.
at 141-42. In considering Second Circuit precedent, the court
noted a "distinction . . . between [i] misrepresentations with
respect to the value of a security, and [ii] misrepresentations
with respect to a party's intention to comply with a particular
agreement," finding the former to state a claim for securities

fraud and the latter to not. Id. at 144. In finding the
employee's claim actionable under the first misrepresentation
type, the court concluded, first, that providing the plaintiff a
grant of equity over a six-year vesting period still counted as
a security covered by Section 10(b) and, second, that by
accepting the offer of employment for the shares, the plaintiff
had functionally purchased the security because he "did exchange
something of tangible value-he changed his way of life and his
job-in return for the stock and stock options." Id. at 145. As
the alleged misrepresentation as to the stock vesting schedule
could have had a material impact on the value of the shares,
plaintiff's claim could not be dismissed at the motion to
dismiss stage. See id. at 147 & n.3.

Dubin supports Plaintiff's argument to a point but,
fatally, not all the way. Dubin supports the contention that
unvested stock options like those that comprised Luxoft's SOP
III, and which were promised to Plaintiff, count as Section
10(b)-covered securities. Unlike in Dubin, however, Plaintiff
has "not allege[d] that he received . . . stock options in
exchange for or as an inducement for acceptance of employment,"
but, rather, the opposite: that he did not receive unvested
stock options when he started, while repeatedly being promised
that he would. Kinsey v. Cendant Corp., No. 04 Civ. 0582 (RWS),

23

2004 WL 2591946, at *8 (S.D.N.Y. Nov. 16, 2004). Moreover, the Complaint alleges not that Defendants failed to inform Plaintiff of the truthful conditions of equity ownership once possessed, like in Dubin, but rather that Defendants failed to provide the shares in accordance with the contested Employment Agreement. See Lawrence, 325 F.3d at 154 (2d Cir. 2003) (citing cases rejecting securities fraud claims "where fraudulent harm [arose] not from [the] purchase of shares but from defendant's refusal to transfer promised shares"). In short, under the present allegation, Plaintiff is not a "purchaser" of Luxoft stock and Defendants' alleged fraudulent statements are not connected to a sale of securities.

Accordingly, Defendants' motion to dismiss the Complaint's Third Claim is granted.

### 3. Breach of Contract Claim (Fourth Claim)

Defendants have moved to dismiss Plaintiff's claim for breach of contract against both Defendants. Plaintiff has alleged that Defendants breached the Employment Agreement by failing to provide him promised job responsibilities, a salary adjustment, Luxoft stock compensation, and ninety days' notice prior to termination. (See Compl. ¶¶ 64-72, 81.) In support of

24

dismissal, Defendants make three arguments: that Plaintiff has not alleged which portions of the contract his claims are based, that Plaintiff's "at-will employment" status bars the claims, and that Plaintiff has failed to allege damages as a result of his termination on less than ninety days' notice. For the foregoing reasons, Defendants' motion with respect to the Fourth Claim is granted in part and denied in part.[2]

### a. Stock Plan Eligibility and Salary Adjustment Claims

Under New York law, the elements of a breach of contract claim are: (1) the existence of an agreement; (2) adequate performance of the contract by the plaintiff; (3) breach of contract by the defendant; and (4) damages. See Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co., 375 F.3d 168, 177 (2d Cir. 2004). Under New York law, the best evidence of what parties to a written agreement intend is what they say in their

---

[2]    For ease of reading, the term Defendants is used generally in this section, though for the Complaint's Fourth Claim, only Luxoft USA, signatory to the Employment Agreement, can be liable. See  Navana Logistics Ltd. v. TW Logistics, LLC, No. 15 Civ. 856 (PKC), 2016 WL 796855, at *5 (S.D.N.Y. Feb. 23, 2016) ("[L]iability for breach of contract does not lie absent proof of a contractual relationship or privity between the parties." (citation omitted)). The Complaint has not plausibly alleged fact sufficient to show that Luxoft Holding intended to be bound by the Employment Agreement. Accordingly, Plaintiff's breach of contract claims against Luxoft Holding are dismissed.

25

writing. Greenfield v. Philles Records, Inc., 98 N.Y.2d 562, 569, 750 N.Y.S.2d 565, 780 N.E.2d 166 (2002). A written agreement that is complete, clear, and unambiguous must be enforced according to its terms. Id. A contract is unambiguous when the contractual language has a definite and precise meaning about which there is no reasonable basis for a difference of opinion. Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp., 595 F.3d 458, 467 (2d Cir. 2010).

Defendants first contend the Employment Agreement did not guarantee that Plaintiff would be entitled to an award of Luxoft stock or to a salary adjustment. In disputing whether the contract's provisions were breached, the issue turns on how the contract could be plausibly read.

Defendants argue the Employment Agreement made any grant of Luxoft shares discretionary: "In addition to (but without duplication of) the Base Salary and any bonus, while Executive is employed by the Corporation, Executive shall be eligible to participate in the Stock Option Plan (subject to approval by the Board and the Corporation's policies) . . . ." (Compl., Ex. 1 ¶ 4(d).) A similar discretionary provision is included in the Employment Agreement for salary adjustments: "Executive's Base

Salary shall be subject to annual review for adjustment at the discretion of the Board . . . ." (Compl., Ex. 1 ¶ 4(a).)

Defendants also note that the Employment Agreement contains a merger clause specifying that the terms set forth within it constitute the entire agreement between Plaintiff and Luxoft USA: "This Agreement records the final, complete, and exclusive understanding of the parties with respect to the matters addressed herein and supersede any prior or contemporaneous agreement, representation, or understanding, oral or written, by either of them." (Compl., Ex. 1 ¶ 14.) This is a valid merger clause, and under New York law bars the "introduction of extrinsic evidence to vary or add to the terms of contract" such as extraneous oral or written agreements. NAB Const. Corp. v. Consol. Edison Co. of N.Y., Inc., 222 A.D.2d 381, 381, 636 N.Y.S.2d 37, 38 (1st Dep't 1995). The Employment Agreement is a fully integrated agreement, and any comments or discussions with respect to Plaintiff's employment, including alleged emails between Plaintiff and Defendants prior to the agreement as Plaintiff's eligibility for Luxoft stock awards or salary adjustments, were extinguished.

Thus, the issue presented with regard to the Luxoft equity grant is whether the parenthetical limitation clause requiring

"approval of the Board and the Corporation's policies" plausibly
modifies the grant of eligibility, Defendants' position, or
merely approval of SOP III, Plaintiff's position. A similar
issue is present as to the salary adjustment review, which
includes a provision noting such review is "at the discretion of
the Board."

From the face of the Employment Agreement, the equity
compensation provision could reasonably support both sides'
positions. The language of the parenthetical can plausibly be
read to indicate that the only limit to Plaintiff receiving
equity is approval of the stock options plan by the Board, as
Plaintiff posits. It can also be reasonably read as Defendants
suggest. But at the motion to dismiss stage, the Court "should
resolve any contractual ambiguities in favor of the plaintiff."
Subaru Distribs. Corp. v. Subaru of Am., Inc., 425 F.3d 119, 122
(2d Cir. 2005). As Plaintiff has plausibly alleged both the
existence of a valid contractual clause and the occurrence of
the requisite condition precedent – the approval of SOP III –
that Plaintiff did not receive Luxoft equity can constitute a
valid breach of contract claim. See Bayerische Landesbank, N.Y.
Branch v. Aladdin Capital Mgmt. LLC, 692 F.3d 42, 56 (2d Cir.
2012) (reversing dismissal breach of contract claim where
contract provision was ambiguous and plaintiff's reading was

28

plausible). Whether Plaintiff ultimately can establish that the contract's equity compensation provision was or should be read the way he has argued is not necessary at this point.[3]

The portion addressing Plaintiff's salary adjustment, however, fares differently. By its terms, the clause makes reasonable sense only as a discretionary limitation on changes to Plaintiff's compensation. While the record so far is absent as to what reasoning Defendants might have had not to review Lankau's salary, based on the Complaint's allegations, it cannot be plausibly inferred on the contract's face that Luxoft USA breached a contractual that gave them discretion not to consider modifying Plaintiff's compensation in the manner Plaintiff has claimed he was entitled. See Keiler v. Harlequin Enter. Ltd., 751 F.3d 64, 69 (2d Cir. 2014) (affirming dismissal of contract claims where relevant contract provision was unambiguous).

Accordingly, Defendants' motion to dismiss as to the portion of Plaintiff's breach of contract claim regarding equity

---

[3] To the extent that Defendants' motion papers can be construed as also arguing that Plaintiff's at-will employment status permitted Defendants not to grant equity, even if the Employment Agreement is as Plaintiff contends, (see Defs.' Mem. in Supp. at 8-9), that argument fails. As discussed below, taking Plaintiff's allegations as true, he was never prospectively informed of any changes to be made to the Employment Agreement's equity compensation provisions.

compensation in Luxoft is denied and as to the portion of Plaintiff's breach of contract claim regarding salary adjustments is granted.

### b. Job Responsibilities

As to the job responsibilities Plaintiff alleges he was promised in the Employment Agreement, Defendants contend that Plaintiff's at-will status entitled it to "alter the terms of Plaintiff's employment at any time and in any manner without Plaintiff's approval," justifying any changes they might have made to the arrangement. (Defs.' Mem. in Supp. at 8, Dkt. 6; see id. at 9 n. 7; Compl., Ex. 1 ¶ 5(a).) Plaintiff responds that at-will employment permits only prospective alterations of employment agreements and that, in the context of altering his job responsibilities, he only accepted those changes because of fraudulent misrepresentations, invalidating his consent. (See Pl.'s Mem. in Opp. at 9.)

Plaintiff is correct that in New York, an employer can avoid contractual liability for unilaterally modifying a provision of an at-will employment agreement only by notifying the employee of the change prospectively. See Klein v. Torrey Point Grp., LLC, 979 F. Supp. 2d 417, 432 (S.D.N.Y. 2013)

("Under New York law, an employer is free to change the terms of at-will employment . . . prospectively, subject to the employee's right to leave such employment if the new terms are unacceptable . . ."). If the employee remains in the "defendant's employment, however, plaintiff is deemed to have assented to the modification and, in effect, commenced employment under a new contract." Bottini v. Lewis & Judge Co., 211 A.D.2d 1006, 1008, 621 N.Y.S.2d 753, 754 (1995) (citation omitted).

The Complaint alleges, and Plaintiff concedes, that Luxoft USA notified Lankau that it was unilaterally changing the terms of his Employment Contract with respect to his job responsibilities, removing from his purview the duties associated with "Delivery and Operations." (See Compl. ¶ 61; Pl.'s Mem. in Opp. at 9.) The Complaint also alleges that Plaintiff's acceptance of this modification was premised on repeated statements made by Defendants that Plaintiff would receive equity compensation if he remained at Luxoft USA, statements Plaintiff alleges were fraudulent and without which he alleges he would not have assented to the modifications. (Compl. ¶ 63). However, even assuming that true, the claim is ultimately barred by the at-will nature of the employment relationship: because Plaintiff could be fired for any reason,

"reliance on representations of future intentions" as part of
any representation made to continuing employment cannot be
plausibly established. Meyercord v. Curry, 38 A.D.3d 315, 316,
832 N.Y.S.2d 29 (2007) (citations omitted).

Accordingly, Defendants' motion to dismiss portions of
Plaintiff's breach of contract claim based on alleged promised
job responsibilities is granted.

### c. Ninety Days' Notice Termination

Lastly, Defendants contend that the Complaint fails to
allege "any damages" arising from its breach of the Employment
Agreement's provision mandating that he receive a ninety-day
notice prior to his termination.

Under New York law, a "nonbreaching party may recover
general damages, which are the natural and probable consequence
of the breach." Forum Ins. Co. v. Zeitman, No. 91 Civ. 7980
(LLS), 1995 WL 546949, at *2 (S.D.N.Y. Sept. 13, 1995) (citing
Kenford Co. v. Cnty. of Erie, 540 N.Y.S.2d 1, 3 (Ct. App.
1989)). Here, the Complaint alleges that Defendants provided
Plaintiff with only seventeen days of notice, (see Compl. ¶ 74),
and that Plaintiff suffered damages from this breach, (Compl.

¶¶ 80-81). Furthermore, Defendants admit in their moving papers that Plaintiff is entitled to damages based on the remaining 73 days of the notice period. (See Defs.' Mem. in Supp. at 11). This portion of Plaintiff's breach of contract claim has been properly alleged, though the degree of damages remains to be determined by a trier of fact.[4]

Accordingly, Defendants' motion to dismiss portions of Plaintiff's breach of contract claim based on the ninety days' notice for termination is denied.

### d. Tortious Interference Claim (Fifth Claim)

Defendants have also moved to dismiss Plaintiff's tortious interference claim against Luxoft Holding, contending that Plaintiff has failed to establish that that "but for" Luxoft Holding's actions, Luxoft USA would not have breached the Employment Agreement.

---

[4]     For example, it is not necessary at this stage to determine if the damages are more or less than the initially proposed severance package offered by Defendants to Plaintiff of $100,000 in lieu of the full ninety days' notice. (See Compl. ¶ 12; Defs.' Mem. in Supp. at 9.)

Under New York law, to state a claim for tortious interference with contract, a plaintiff must allege: "(1) the existence of a valid contract between the plaintiff and a third party, (2) defendant's knowledge of the contract, (3) defendant's intentional inducement of the third party to breach the contract or otherwise render performance impossible, (4) an actual breach of the contract, and (5) damages to the plaintiff." Ace Arts, LLC v. Sony/ATV Music Pub., LLC, 56 F. Supp.3d 436, 450 (S.D.N.Y. 2014) (internal quotation marks and citations omitted). "[A] plaintiff must show that the third party would not have breached the contract but for the activities of the defendant and that the defendant used wrongful means to induce the third party to breach the contract." Id. (quoting St. John's Univ., N.Y. v. Bolton, 757 F. Supp. 2d 144, 172 (E.D.N.Y. 2010) and Orange Cnty. Choppers, Inc. v. Olaes Enter., Inc., 497 F. Supp. 2d 541, 561-62 (S.D.N.Y. 2007)) (internal quotation marks omitted).

While parts of Plaintiff's breach of contract claim survive, as detailed above and provide the opening for a tortious interference claim on those portions, the claim must ultimately be dismissed because Plaintiff has failed to plausibly allege that Luxoft Holding was a "but for" cause of the allege contractual breaches. Plaintiff has alleged that

34

Luxoft Holding was aware of the Employment Agreement, (see Compl. ¶ 115), and made unsupported, conclusory claims that Luxoft Holding was responsible for decisions regarding Plaintiff's employment, including termination, (see Compl. ¶ 43). While a pleading "need not detail the exact circumstances" causing the interference, these allegations, alone, cannot plausibly support the conclusion that activities of Luxoft Holding was a "but for" factor in the decisions of Luxoft USA to impact Plaintiff's employment. Special Event Entm't v. Rockefeller Ctr., Inc., 458 F. Supp. 72, 78 (S.D.N.Y. 1978) (dismissing tortious interference claim when lacking "but for" showing). The absence of additional allegations is fatal.

Accordingly, Defendants' motion to dismiss the Complaint's Fifth Claim is granted.

**Conclusion**

For the foregoing reasons, Defendants' motion to dismiss Plaintiff's Complaint is granted in part and denied in part.

It is so ordered.

**New York, NY**
**July // , 2017**

ROBERT W. SWEET
U.S.D.J.

36